[Civ. No. 45464. Second Dist., Div. Five. Jan. 21, 1976.]

CITY OF LOS ANGELES, Plaintiff and Respondent, v.
ROBERT H. LOWENSOHN et al., Defendants and Appellants.

COUNSEL

Victor R. Hansen, Oliver, Stoever & Laskin, Richard Laskin and C. Edward Dilkes for Defendants and Appellants.

Dolle & Dolle, Hodge L. Dolle, Sr., Hodge L. Dolle, Jr., and Gideon Kanner as Amici Curiae on behalf on Defendants and Appellants.

Burt Pines, City Attorney, Milton N. Sherman, Chief Assistant City Attorney, James H. Pearson, Assistant City Attorney and James L. Spitser, Deputy City Attorney, for Plaintiff and Respondent.

OPINION

**STEPHENS, Acting P. J.**—This appeal is taken from a judgment in an eminent domain action brought by respondent, the City of Los Angeles.

The action was initiated for the purpose of condemning 80 acres of land in the Palmdale area for airport purposes. The property was owned by appellants, Dr. and Mrs. Lowensohn, who were awarded $440,000 by the jury as compensation for their land. Appellants moved for a new trial; this motion was denied.

## FACTS

In 1962 appellants purchased the subject property for investment purposes. From the time of the purchase to the time of the eminent domain proceedings, the land remained vacant, and no improvements were accomplished. Beginning in 1959, the property was continuously zoned M-2½. This designation, used by the Regional Commission of Los Angeles County, permitted heavy industrial uses with a particular allowance for aircraft manufacture and assembly.

A general plan, developed in 1968, revealed that the planning area of which appellants' property was a part encompassed 9,500 acres devoted to industrial use and 5,300 acres devoted to quasi-industrial use. This latter acreage had been the site of a private civilian airfield. In 1954, however, the airfield was acquired by the United States Air Force and designated as Plant 42, a facility to be utilized for the production and testing of aircraft under defense contracts. In addition to its use as a security complex for the classified production of military equipment, Plant 42 was also the subject of a 1967 joint use agreement between the City of Palmdale and the Air Force providing for civilian use of the field for scheduled flights.[1]

Of those civilian contractors operating on the field, the major work was carried on by Lockheed. In May of 1968, Lockheed announced that it was going to construct civilian assembly facilities off government land for its Tristar or L-1011 aircraft; Lockheed completed the project in 1970. The 1968 zoning plan had taken into account the Lockheed project and called for uses that required large parcels of land. The subject property was described as such a parcel as opposed to one which might be used for a small industrial park.

Following discussions which had commenced in 1963, the board of airport commissioners adopted a resolution in August, 1968 requesting an ordinance of condemnation of certain property for airport purposes.

---

[1]In 1969 the City of Los Angeles took over as lessee of the property.

In February, 1969, an ordinance was adopted by the Council of the City of Los Angeles directing the city attorney to commence eminent domain proceedings in connection with the "Palmdale Intercontinental Airport." The ordinance was published in the Los Angeles Daily Journal on February 21, 1969, and became effective on March 23, 1969. Appellants' property was one of 2300 separate parcels sought to be condemned. In their entirety, these parcels represented approximately 17,500 acres. A complaint for condemnation of appellants' land was not filed by respondent until August 28, 1972.

The eminent domain proceedings which followed were bifurcated. A first trial was held without a jury to resolve the legal issue of whether or not respondent had delayed unreasonably in bringing the condemnation action. Upon the evidence presented, the court found that respondent had so delayed, and ruled that "the issue of precondemnation damages, if any, commencing August 6, 1969, to be awarded defendant . . . is to be considered by the jury at the trial on February 14, 1974."

On February 19, 1974, the jury trial commenced to determine the fair market value of the subject property as of November 12, 1973, and the damages, if any, which were caused by respondent's unreasonable delay in bringing the action. During the proceedings, Robert W. Beeney, a highly qualified real estate appraiser, was called as a witness. Mr. Beeney had been retained by appellants for the purpose of assessing both the value of the subject property, absent any influence of the proposed airport, and the losses occurring to appellants as a result of respondent's delay in filing its complaint. To formulate his opinion of the value of appellants' property, Mr. Beeney had examined 15 sales of other property in the area which had taken place between 1967 and 1969. These sales included one to Retlaw Corporation, a subsidiary of Walt Disney Enterprises, in 1968. In that purchase, the corporation acquired 773 acres of land immediately north and northeast of appellants' property.

With respect to the issue of precondemnation damages, Mr. Beeney was primarily examined on voir dire. Outside of facts previously set forth, his testimony revealed the following: The subject property was level, but had no natural drainage courses. Although utilities were available for the property, none had been hooked up. Neither sewer nor water pipes lay adjacent to the property. Excluding the influence of the suggested project from his consideration, the appraiser thought that the

highest and best use to be made of the property was in accordance with existing zoning and was exemplified by Lockheed's civilian plant. Mr. Beeney testified, however, that he had found no vacant M-2-½ zoned property without utilities that had been rented. The only rented property which was similarly zoned was that leased by the Air Force. Further, appellants had not rented their property for any purpose from the date of acquisition (1962) to August 6, 1969.

After August 6, 1969, the appraiser felt that appellants' property had become "unsalable" because of the "threat of condemnation." Despite the influences of the Lockheed project in 1968, the joint use of the airport by respondent and the Air Force in 1969, and the completion of a freeway in the vicinity in 1973, Mr. Beeney had found only one sale of property in the area after 1969. However, of the 15 sales taking place from 1967 to 1969, all involved individual parcels smaller than appellants' property. Additionally, even though sales had taken place, the only industrial firm to have actually developed property in the M-2-½ zoned area was Lockheed. Retlaw's large purchase of land adjacent to appellants' was for the purposes of investing and ultimately reselling the property to those pursuing uses called for by the general plan. Assuming that someone was interested in either leasing or purchasing the subject property, the appraiser estimated that as much as five to ten years would have been required to develop the property to its highest and best use. Mr. Beeney was unaware of anyone approaching appellants seeking to purchase their property for industrial development prior to August 21, 1968.

Mr. Beeney valued appellants' property as of November 1973 at $800,000. He arrived at this appraisal by giving the property the benefit, if any, of activities in the area, other than the 17,500-acre airport project, which would have caused a rise in its value. Mr. Beeney stated that his estimation of the property's fair market value was determined separately from the ability to rent and without reference to any enhancement or depreciation in value caused by the proposed project. As of August 6, 1969, Mr. Beeney valued the fee at $680,000. On a rental analysis analogous to that used for "construction easements," Mr. Beeney assessed appellants' precondemnation damages at $4500 monthly, a figure based on an 8 percent per annum fair return on the property, as valued at $680,000. Along with the rental recovery, Beeney added a sum equivalent to a straight reimbursement for taxes paid by appellants on the property during the period of delay.

On the basis of this testimony, the court sustained an objection to appellants' offer of proof of precondemnation damages. In his findings of fact and conclusions of law, the trial judge found that although respondent had unreasonably delayed the condemnation of the subject property, "as a matter of law, the evidence herein would not justify damages for delay in bringing this action to trial." In additional findings of fact and conclusions of law, the judge stated that "[appellants] suffered no damage because of or as a result of said delay."

The court also made other rulings of concern to appellants during the course of the trial. At one point, respondent's attorney revealed that one of the jurors in the case had approached both himself and Mr. David S. Mason, respondent's appraiser, in the corridor and asked if he could talk to the two men. Respondent's attorney told the juror that he could not talk to him and excused himself. Thereupon the juror addressed Mr. Mason and stated that he had a question relative to a tax situation on some property located in another state. Mason was informed by respondent's attorney that it would not be proper for him to converse with the juror until after the trial. Although Mason refrained from conversation with the juror, he did appear to give the juror his business card so that he could call Mason "next week or something." Denying appellants' motion for discharge of the juror or, alternatively, for a mistrial on the grounds of juror misconduct, the court found that "legal cause has not been shown sufficient to justify such action."

The court also overruled appellants' objection to a question asked of Mr. Beeney during cross-examination. The witness was asked whether his investigation revealed a court determination of the date of probable inclusion in the proposed airport project of the property involved in the "Retlaw sale."

The court sustained the objection of respondent to the introduction of a plan appearing in the Los Angeles Times depicting property to be used for industrial purposes in the Palmdale area. Although the court characterized Mr. Beeney's testimony with respect to the plan as "hearsay," other inquiries relevant to the admissibility of the evidence were made of the witness by both the court and respondent prior to the court's ruling. It was discovered that the witness did not know the source of the plan; he did not know if the plan was one officially authorized by respondent or even if it was one of respondent's public information releases. It was also uncertain whether the witness had actually seen the plan in the newspaper.

Appellants contend that the trial court erred by failing to submit to the jury the issue of precondemnation damages, reflected in loss of rental income and payment of "holding costs" (*i.e.,* taxes, insurance) during the period of unreasonable delay; by failing to discharge a juror guilty of misconduct; by permitting respondent to cross-examine appellants' appraiser about a judicial determination in another condemnation case involving the Palmdale airport; and by excluding evidence of public statements concerning proposed industrial land uses within the airport project. Appellants assert that the effect of these rulings, taken together or individually, was to deny them a full and fair trial and that, accordingly, this court should vacate the judgment below and return the case for a new trial in its entirety.

## DISCUSSION

In dealing with appellants' initial contention that the trial court erred by excluding evidence of precondemnation damages from jury consideration, it must first be determined whether the action undertaken by the court contravened the superior court's policy of bifurcating trials in eminent domain proceedings. Appellants argue, with support by amicus curiae, that the trial court's ruling enabled respondent to take "two bites at the apple" with regard to the issue of precondemnation damages: Unable to procure a successful determination of this issue at the first trial, respondent was able to try again at the valuation trial to have the evidence and issue of precondemnation damages withdrawn from the jury's deliberation.

█ This contention, however, is without merit. In the first trial only the legal issue of the reasonableness of the time within which respondent brought the eminent domain proceedings was considered. As the judge at that trial stated: "I am not to determine the amount of any damages." His final order read: "[T]he issue of precondemnation damages, *if any,* commencing August 6, 1969, to be awarded defendant . . . is to be considered by the jury at the trial on February 14, 1974." (Italics added.). Thus, there was no resolution of the question of whether the unreasonableness of respondent's delay did in fact damage appellants. This inquiry was reserved for the jury trial with neither respondent nor appellants being able to contest the issue at the legal issue trial. If appellants, having the burden of proof with respect to precondemnation damages (*Klopping* v. *City of Whittier,* 8 Cal.3d 39, 49 [104 Cal.Rptr. 1, 500 P.2d 1345]), presented an offer of proof encompassing insufficient evidence of such damages, the trial judge at the valuation proceeding was entitled, as a

matter of law, to exclude the proffered evidence without submission to the jury since no damages would have been produced in evidence. (Cf., *Kaufman & Broad Bldg. Co. v. City & Suburban Mortg. Co.,* 10 Cal.App.3d 206, 216-217 [88 Cal.Rptr. 858] (directed verdict).)

Thus the primary issue of this appeal is whether the trial court erred in finding that appellants had suffered no precondemnation damages in the form of either loss of rental income or payment of "holding costs."

The ability of a condemnee to recover for damages resulting from an unreasonable delay by a condemner in bringing an eminent domain action was recognized by the California Supreme Court in *Klopping* v. *City of Whittier,* 8 Cal.3d. 39 [104 Cal.Rptr. 1, 500 P.2d 1345]. The court held that "a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Id.,* at p. 52.) The plaintiffs in *Klopping,* who had initiated the action by seeking recovery for damages under inverse condemnation, specifically alleged that they were unable to fully use their properties and had suffered a loss of rental income. On this basis, they sought to prove that the fair market value of their properties had diminished during the period of unreasonable delay and that this diminution in market value was attributable to the precondemnation statements of the defendant. (*Id.,* at p. 53.)

The court approved this method of determining precondemnation damages by stating: "It has long been established that rent is an appropriate criterion for measuring fair market value. [Citation.] '[I]f property is rented for the use to which it is best adapted, the actual rent reserved, capitalized at the rate which local custom adopts for the purpose, forms one of the best tests of the value . . . .' [Citation.] On the date on which an announcement of future intent to condemn is made, the market value may properly be measured by the anticipated rental income· to be received throughout the lifetime of the property. If as a result of precondemnation statements rental income is lost, the anticipated rental income would be diminished and a decline in the fair market value would follow." *(Id.)* ▇ Unlike the situation in which there has been a de facto taking, the valuation date for purposes of determining precondemnation damages remains the date of issuance of the summons; thus the condemnee will only be compensated for those losses caused by

the precondemnation publicity as opposed to losses occasioned by a natural disaster or by a general decline in the property's value.

The rule in *Klopping* was considered in the recent appellate court decision in *Stone* v. *City of Los Angeles,* 51 Cal.App.3d 987 [124 Cal.Rptr. 822]. In that case, the plaintiffs, who had purchased the subject property in 1967, filed a complaint for inverse condemnation seeking damages caused by the city's delay in bringing its eminent domain action. The period of delay was from September 7, 1971, to March 10, 1973. The city cross-complained for condemnation of the property. The property in question constituted 324.95 acres; one-half of the property was zoned for industrial uses, one-half, for agricultural uses. During the period of plaintiffs' ownership, the property was subject to a farm lease. In 1969, the city passed its ordinance, pursuant to the earlier resolution, creating the Palmdale Intercontinental Airport. Considerable publicity followed this action, and as summarized by the court, the following circumstances resulted: ". . . . After the announcement of the intercontinental airport project, the Stones determined that it was not economically justifiable to spend the money needed to repair and replace the pumps, irrigation pipes and other farm equipment on the property. The farm lease was renewed soon after it expired August 25, 1968, but rental income 'constantly diminished as equipment wore out' and, whereas the growing of alfalfa or carrots was the original farming endeavor, '. . . eventually it became non-economical altogether, and is now pasture land for sheep . . . .' Stone testified that he took no steps toward further industrial development of the property. He had hired a man and 'in general I did go forward rather rapidly . . . with planning the development of the property on a comprehensive basis,' but, '[b]ecause of the decision to condemn the property I couldn't see that I could do anything with the land further. It didn't make sense to go on spending money concerning an industrial development.' " (*Id.,* at p. 992.)

The plaintiffs' expert witness determined that the value of the property at its highest and best use (airport related industrial use)[2] was $7500 per acre, a figure upon which the value of the property at the date of taking ($2,437,125) was also based.[3] Given this value per acre, the plaintiffs'

---

[2]Although use of the property for airport related industrial use would apparently have required a zoning change, the court concluded that the opinion of plaintiffs' expert witness as to the value of the property did not rest exclusively upon the probability of a change in zoning, but rested upon other factors. (*Stone* v. *City of Los Angeles,* 51 Cal.App.3d 987 [124 Cal.Rptr. 822].)

[3]The court did not discuss whether the market value of the property at the time at which the unreasonable delay began, based on its highest and best use, had been

expert assessed a rental value of 8 percent on a year-to-year basis. (*Id.,* at p. 991.) The court noted that: ";Metcalfe testified that the rental value of the property was a net 8 percent return to the Stones, *all* costs of maintenance to be paid by the tenant. Metcalfe testified: 'The practice is to set the initial rental up on a net return to the owner basis, and provide that the tenant shall pay the expenses. . . . The rental to be paid will be a net rental to the owner and it [the lease] specifically provides that the tenant shall take care of all of the expenses.' Metcalfe testified, in essence, that the property had a rental value of 8 percent, net, per year from 1968-1973, but the Stones were unable to realize such percentage, either by leasing or using the property, because of its threatened condemnation for use in the proposed intercontinental airport. *Thus, the Stones lost the difference between the rental value and the actual farming (or grazing) income. To us, that theory seems a credible one to submit to a jury;* city's objections go to the weight to be accorded to the testimony, not its admissibility." (*Id.,* at p. 993; italics added.)

The court dismissed the city's contention that the plaintiffs were not entitled to damages in addition to an award of the property's market value " 'unaffected by the announcement of the project' " and found that an award of the value of the property as of the date of value "is to be distinguished from loss of use damages measured by loss of rents before that time. . . . [S]uch damages were awardable under the evidence." (*Id.,* at pp. 993-994.) On the question of whether "delay" damages may be based in part on expenses regarding the property (i.e., property taxes, insurance, management fee, and incidental accounting), the court concluded that the "expenses testified to did not enter generally into the valuation of the property for condemnation purposes, although expense would seem to be relevant for 'delay' damages. We believe that damages for 'delay' were awardable; hence, that the relevant testimony regarding expenses properly was received." (*Id.,* at p. 994.) On the basis of this analysis, the court upheld the award of $150,000 for delay damages in addition to the award of $2,112,175 for condemnation of the property.[4]

determined. However, based on figures given by the court and the calculations of plaintiffs' expert witness, the property apparently had a value of $617,405 ($1,900. per acre) at the date of purchase and a value of $2,437,125 at the date of valuation.

[1]The *Klopping* method of ascertaining the loss of rental is but one way of establishing the damage. Where the land has appreciated in value despite the delay, another method of establishing damages would be to show termination of actual rental, or reduction thereof, and to show the actual costs of expenses (i.e., taxes, etc). In ascertaining such "delay damages," we see no impediment to arriving at such damages independently of, and in addition to, the ascertainment of the fair market value of the land being subjected to condemnation, whatever the reasonable method of establishing such damage. Any loss

■ In the instant case, neither the holding in *Klopping* nor that in *Stone* is of assistance to appellants since their offer of proof presented no evidence that they had suffered precondemnation damages. To begin with, there appears to have been no actual loss of rental income or sales with respect to the subject property as a result of the activities of respondent. Appellants purchased the property for investment purposes; they had never rented the property prior to 1969, and there was no evidence of their willingness or an opportunity to do so. There was no evidence of any rentals of vacant land in the area zoned M-2-½ either before or after the announcement of intent to condemn. In addition to the fact that the land was vacant, no utilities had been attached, and no improvements had been undertaken on the property. Five to ten years would have been required to develop the land to its highest and best use, excluding its use for the proposed airport. As to potential sales, the only industrial activity in the area besides Plant 42 was that in which Lockheed was engaged; the land required for its plant, however, included none of appellants' property. The only other purchaser of a large parcel of land in the area, Retlaw Corporation, was interested, like appellants, only in the property's potential for investment, and not for industrial development.

Given these facts and the decisions in *Klopping* and *Stone,* we hold that the trial court did not err in withdrawing the issue of precondemnation damages from jury consideration based on the evidence received during voir dire examination of appellants' appraiser. In sum, appellants sought recovery for something that was nonexistent in fact and constituted pure fiction. There is no recovery via condemnation for the taking of a pipe dream. Since appellants failed to show "delay *damages,*" evidence of expenses or "holding costs" would have been inadmissible. (See *Stone* v. *City of Los Angeles, supra,* 51 Cal.App.3d 987, 994.)

Appellants also seek reversal of the judgment because of the trial court's failure to discharge a juror or, alternatively, to grant appellant's motion for mistrial on the ground of juror misconduct. Appellants rely on the decision in *Garden Grove School Dist.* v. *Hendler,* 63 Cal.2d 141 [45 Cal.Rptr. 313, 403 P.2d 721], as being "squarely on point."[5] In that

---

of rental computed on the interest return-property value rationale must consider the value (and the best use) of the land at the time of the rental loss and not at the time of condemnation sale.

[5]*Hendler* involved the application of the following provision of section 605 of the Code of Civil Procedure: "If at any time, whether before or after final submission of the case to the jury, a juror dies . . . or upon other good cause shown to the court is found to

case, the only fact to which the court alluded was that plaintiff's counsel was found "talking" during a recess to a juror who later became foreman of the jury. The court found that the "judge had the discretion to dismiss the juror for this misconduct and that he erred in failing to do so." (*Id.,* at p. 145.) In the case here on appeal, respondent's counsel specifically informed the juror that he could not discuss anything with the juror during the trial.

However, it is not the interaction between respondent's counsel and the juror from which appellants contend the misconduct arose, but rather the confrontation between the juror and respondent's appraiser. In this regard, the decision in *City of Pleasant Hill* v. *First Baptist Church,* 1 Cal.App.3d 384 [82 Cal.Rptr. 1], is on point. There the city brought a condemnation action against property owned by the church. The city claimed prejudicial error because its motion for mistrial and its request for replacement of a juror with an alternate had been denied after testimony revealed that a conversation had taken place between the juror and an appraisal witness for the church. The juror involved had admitted in voir dire that he had purchased a home from the witness 18 years before. The two men were observed during the course of the trial conversing for about two minutes on the courtroom steps. The juror was overheard telling the witness: " 'I will drop in and see you when this is over.' " (*Id.,* at p. 427.) Upon interviewing the witness, the trial court was satisfied that only a social greeting recalling the past transaction, with no discussion of the pending case, had taken place between the two.

In distinguishing *Hendler,* the appellate court stated: "The facts of this case do not dictate a categorical extension of the same principle to a juror who converses with a witness." (*Id.,* at p. 427.) The court also quoted the following passage from *People* v. *Thomas,* 108 Cal.App.2d 832, 837 [239 P.2d 914]: " 'Where misconduct of a juror is urged, prejudice from that misconduct must be shown.' " (*Id.,* at p. 428). The court concluded that the trial court did not abuse its discretion in finding the misconduct not to be prejudicial and that the decision would not be disturbed on appeal.

Nothing more prejudicial occurred between the juror and respondent's appraiser in the present case than took place between the juror and the

be unable to perform his duty . . . the court may order him to be discharged and draw the name of an alternate . . . ."

appraisal witness in *First Baptist Church, supra.* Not only were the two individuals not previously acquainted and the question asked by the juror unrelated to the pending action, but the appraiser specifically refused to answer the question or converse with the juror. ■ Upon this evidence, we cannot conclude that the trial court abused its discretion.

Appellant also contends that it was error to permit respondent to cross-examine appellants' appraiser about the ruling in another condemnation case involving the Palmdale airport project. The case in question involved the "Retlaw sale" upon which appellants' appraiser relied in valuing appellants' property. ■ As a witness in a condemnation proceeding can be cross-examined with respect to prices paid for similar property in the vicinity (*Regents of University of California* v. *Morris,* 266 Cal.App.2d 616, 641 [72 Cal.Rptr. 406]), questions directed toward the extent of the appraiser's knowledge of the nature and circumstances of the sale which may have influenced his opinion are both relevant and permissible. Although appellants contend that the court ruled inconsistently on this matter, the record establishes that the second ruling involved a question directed to a different witness and related to a different subject matter and was therefor not inconsistent.

■ The trial court also did not err in excluding evidence of public statements or plans indicating proposed industrial land uses within the airport project. Although an expert witness in a valuation trial can base his opinion on hearsay as provided for by section 814 of the Evidence Code,[6] that section also required at the time of trial that the matter upon which he relies must be of a "type that reasonably may be relied upon by an expert in forming an opinion as to the value of property." As the appraiser's testimony revealed foundational deficiencies with regard to the plan (*i.e.,* insufficient knowledge of the source of the plan), the trial

---

[6]Although Evidence Code section 814 has been amended (effective Jan. 1, 1976), at the time of the instant proceedings, it provided: "The opinion of a witness as to the value of property is limited to such an opinion as is based on matter perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion as to the value of property and which a willing purchaser and a willing seller, dealing with each other in the open market and with a full knowledge of all the uses and purposes for which the property is reasonably adaptable and available, would take into consideration in determining the price at which to purchase and sell the property or property interest being valued, including but not limited to the matters listed in Sections 815 to 821, unless a witness is precluded by law from using such matter as a basis for his opinion."

court could properly exclude such evidence as not being of the type that would "reasonably" be relied upon in forming an opinion as to property values.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied February 10, 1976, and appellants' petition for a hearing by the Supreme Court was denied March 31, 1976.