[S.F. No. 23606. Sept. 15, 1978.]

ARTHUR E. JONES et al., Plaintiffs and Respondents, v.
THE PEOPLE EX REL. DEPARTMENT OF TRANSPORTATION,
Defendant and Appellant.

146

COUNSEL

Harry S. Fenton, Robert F. Carlson, Gordon S. Baca and Richard B. Williams for Defendant and Appellant.

Evelle J. Younger, Attorney General, E. Clement Shute, Jr., R. H. Connett, Assistant Attorneys General, Richard C. Jacobs, Deputy Attorney General, John H. Larson, County Counsel (Los Angeles), and Marie Stephens, Deputy County Counsel, as Amici Curiae on behalf of Defendant and Appellant.

Desmond, Miller, Desmond & Bartholomew, Stephen James Wagner and Richard F. Desmond for Plaintiffs and Respondents.

Gideon Kanner, Fadem, Berger, McIntire & Norton, Michael M. Berger, Goldstein, Barceloux & Goldstein, Burton J. Goldstein, Rogers, Vizzard & Tallett, John D. Rogers, Hahn Cazier Hoegh & Leff, Ernest Leff and Andrew E. Katz as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

MOSK, J.—Plaintiffs, Arthur and Susan Jones, are the owners of nine and one-half acres of Sacramento County land, fronting on Fair Oaks Boulevard. They purchased the property in 1963, and thereafter the Department of Public Works (now the Department of Transportation) announced plans to construct a freeway which would cross the northern portion of the property, requiring the acquisition of approximately two and one-half acres of plaintiffs' land. The proposed freeway would have cut off access from Fair Oaks Boulevard, and without such access plaintiffs were unable to subdivide the property.

Plaintiffs were unsuccessful in attempts to sell the land, and in 1973 they filed an action in inverse condemnation, alleging that the state had acted unreasonably and oppressively, depreciating the value of their property, and preventing its sale or development as a subdivision. After a trial by jury, plaintiffs were awarded $75,000 for diminution in the fair market value of their land and $25,000 in attorneys' fees and costs.[1] The

---

[1]The jury returned a verdict for $175,000, based upon an erroneous assumption. Plaintiffs conceded that the verdict was erroneous and stipulated to a reduction to $75,000.

trial court denied the state's motions for a new trial and for judgment notwithstanding the verdict; this appeal followed.

Several months after judgment was rendered, the Legislature deleted the proposed freeway from the highway system. (Stats. 1975, ch. 244.)

The northern boundary of plaintiffs' land has frontage on Fair Oaks Boulevard. It is bounded on the south by Cheryl Lane, which is not a county road, and in which plaintiffs own only a one-third undivided interest. On the eastern border other persons own lots which are served by Bannister Avenue, running in a north-south direction, and providing access to both Fair Oaks Boulevard and Cheryl Lane. The property is unimproved except for two old houses in poor condition which are rented for small sums, and which plaintiffs intended to demolish when they developed the property.

Plaintiffs were residents of Sacramento when they bought the property in 1963 for $55,500 as an investment; they anticipated developing the land as a subdivision. They had no knowledge of a freeway affecting the land being under consideration at the time they made the purchase. Mrs. Jones testified that a major inducement for buying the property was the frontage on Fair Oaks Boulevard. In 1964, plaintiffs moved from Sacramento, and then decided to sell the property.

They first became aware that their property would be affected by the freeway in 1964. However, at that time and for several years thereafter, the design of the freeway and its effect on plaintiffs' land had not been determined by state officials.

Under section 100.2 of the Streets and Highways Code, when the department proposes to construct a freeway, it may enter into an agreement (freeway agreement) with the local legislative body to close or reroute streets which intersect with the freeway, and no street may be opened or connected with a freeway without the permission of the California Highway Commission.[2] In 1964, the department and the

---

[2]Section 100.2 of the Streets and Highways Code provides: "The department is authorized to enter into an agreement with the city council or board of supervisors having jurisdiction over the street or highway and, as may be provided in such agreement, to close any city street or county highway at or near the point of its interception with any freeway or to make provision for carrying such city street or county highway over or under or to a connection with the freeway and may do any and all work on such city street or county highway as is necessary therefor. No city street or county highway shall be

County of Sacramento entered into such an agreement for the portion of the freeway affecting plaintiffs' land. The map attached to the agreement indicated that there would be an overpass over Fair Oaks Boulevard and that Bannister Avenue would be closed. In 1966, plaintiffs submitted a subdivision map to the county for 23 single family lots, showing access from Fair Oaks Boulevard into the subdivision. The map was tentatively approved by the planning commission because the location of the freeway and its date of construction were so indefinite that the commission "did not feel that they had grounds to deny approval." The approval lapsed after one year, and when plaintiffs applied for a renewal in 1967, the county refused to approve the map on the ground that under section 100.2 of the Streets and Highways Code and the freeway agreement "no roadway can be approved on this subdivision entering the interchange area" without compliance with the section.

This action effectively deprived plaintiffs of access from Fair Oaks Boulevard, and such access was necessary in order to subdivide the property. As noted above, Cheryl Lane is not a county road, and plaintiffs had only a one-third interest in it. In order to obtain approval of a subdivision with access from Cheryl Lane, plaintiffs were required to secure the consent of the owners of the remaining interests in the street to dedicate it for public use. They were unsuccessful in this effort.

In 1969, the state revised its freeway plans and entered into a new freeway agreement with the county. According to the new plan, Bannister Avenue was rerouted so as to create a frontage road, providing access to the north end of plaintiffs' land. Thus, if and when the freeway and the frontage road were built, according to the 1969 plan, plaintiffs would have access from the freeway to the northern part of their land. There was no indication, however, when the frontage road would be built, or who would pay for its construction.

Plaintiffs sought repeatedly to ascertain from state officials the dimensions of the property which would be taken for the freeway and the date acquisition could be expected. It was not until 1968 that the design plans were formulated to indicate the exact amount of land required. The

closed, either directly or indirectly, by the construction of a freeway except pursuant to such an agreement or while temporarily necessary during construction operations. No city street, county road or other public highway of any kind shall be opened into or connected with any freeway unless and until the California Highway Commission adopts a resolution consenting to the same and fixing the terms and conditions on which such connection shall be made and the said commission may give or withhold its consent or fix such terms and conditions as in its opinion will best subserve the public interest."

acquisition date for the property was postponed a number of times at the time of the trial in 1974 and was still scheduled for some years in the future.

The state has a program allowing for purchase of a limited number of properties needed for highways on a hardship basis prior to the normal acquisition date. It acquired several parcels along the freeway route under this program, including the land surrounding the portion of plaintiffs' property which the state planned to purchase. Plaintiffs applied for purchase of the property by the state on grounds of hardship, and in 1969 the state made an offer of $15,847 for the two and one-half acres required, but plaintiffs refused the offer because it contained no severance damages attributable to the lost access from Fair Oaks Boulevard.

State officials were aware that the county had refused to approve a subdivision map for plaintiffs' land showing access directly from Fair Oaks Boulevard because of the state's requirements for the freeway. They also knew that plaintiffs owned only a partial interest in Cheryl Lane, and that their property was essentially landlocked for subdivision purposes.

From 1964 onward, plaintiffs listed the property for sale with a number of real estate brokers, and formulated several alternative plans for its development in order to render the property saleable. Despite vigorous efforts by plaintiffs and their agents, developers were not interested in buying the property because there was no access which would allow subdivision, and it was not clear when or whether access would ultimately be provided by construction of the frontage road. There was testimony that the value of the land was diminished by $75,000 if it could not be used for a subdivision.

The cause was submitted to the jury on the theory enunciated in *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345]. The jury was instructed that it should find in plaintiffs' favor if the state unreasonably delayed the filing of an action in eminent domain following an announcement of intent to condemn, or diminished the value of plaintiffs' property by other unreasonable conduct prior to condemnation.

In *Klopping*, we reversed a judgment for defendant city in an action for inverse condemnation. The city first initiated condemnation proceedings against plaintiffs' properties; subsequently it dismissed the action but

announced its intention to take the precise property in the future. Plaintiffs alleged that they had lost rental income as a result of the precondemnation announcements. We held that a cause of action for inverse condemnation was stated by allegations that a diminution in market value resulted from "unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation . . . ." (8 Cal.3d 39 at p. 52.)

The state contends that an announcement of intent to condemn is essential for the application of the *Klopping* rationale, and since there was no formal resolution to condemn plaintiffs' property, they have not stated a cause of action for inverse condemnation.

■ We need not decide the merits of this argument, for we are of the view that plaintiffs are entitled to recover damages as a matter of law because they were denied access to their land from Fair Oaks Boulevard, and this denial prevented development of the land as a subdivision. The evidence establishes that plaintiffs purchased the property because of its value as a subdivision, that the proposed freeway would cut off access from Fair Oaks Boulevard unless and until a new frontage road from the freeway was built, and that without such access the property was not saleable as a subdivision. It is settled that substantial impairment of access entitles a landowner to compensation. (*City of Los Angeles* v. *Ricards* (1973) 10 Cal.3d 385, 387-388 [110 Cal.Rptr. 489, 515 P.2d 585].) There can be no question here that the impairment was substantial.

Nevertheless, the state denies liability, relying upon *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111]. There, a city and county had adopted a general plan depicting a street extending through the plaintiff's undeveloped property, and the city denied the plaintiff a building permit on the ground that the building plans made no provision for the proposed street.

We held that the plaintiff had not stated a cause of action against the county because the enactment of a general plan for future development of an area, indicating public uses of privately owned land, did not amount to inverse condemnation. We reasoned as follows: The adoption of a general plan is considerably short of a firm declaration of an intention to condemn; the plaintiff in an inverse condemnation action must show the invasion of a property right which directly and specially affects him to his injury; the county had not refused the plaintiff

permission to build, nor had it placed any obstacles in the path of the development; a plan was subject to alteration, modification or ultimate abandonment, so that there was no assurance that any public use would eventually be made of the plaintiff's property; and if the county were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential use on a general plan, the planning process would be severely hampered.[3]

The state contends that the adoption of the freeway route here is equivalent to the enactment of the general plan in *Selby*. We can acquiesce in the following proposition: if the only acts of which plaintiffs complain were the adoption of the route, the designation of their land for future acquisition, and the purchase of some of the properties along the right of way, there would be no such direct and special interference with plaintiffs' rights as to justify an action in inverse condemnation. As was pointed out in *Smith* v. *State of California* (1975) 50 Cal.App.3d 529, 536-537 [123 Cal.Rptr. 745], planning and construction of a freeway requires a substantial period of time, and a holding that announcement of the plan for the freeway results in inverse condemnation of properties designated for ultimate acquisition would result in the forced purchase by the state of large amounts of property which might never be used and would severely hamper the government's ability to make needed improvements in the highway system. The need for flexibility in planning, changing the design of, or even abandoning a proposal for a highway militates against the theory that an action for inverse condemnation lies for the general effects of such conduct.

Here, however, the state went further. It effectively denied plaintiffs the right to subdivide their land by depriving them of the access required for subdivision. Although it was the county which refused to approve plaintiffs' subdivision map providing for access from Fair Oaks Boulevard, the reason given for the refusal was the freeway agreement with the state and the provision of section 100.2 of the Streets and Highways Code that no road could be opened into a freeway without permission of the California Highway Commission.

The state contends that this provision is applicable only after a freeway has been built, claiming in essence that the county erroneously interpreted the freeway agreement and the section as compelling it to deny access

---

[3]In *Selby* we held, however, that the plaintiff had stated a cause of action against the city in mandamus for its refusal to issue the building permit.

from Fair Oaks Boulevard, and that plaintiffs had the right to such access at all times. We conclude the state is estopped from advancing such a contention. From 1967 onward, state officials were aware that the county had denied access to Fair Oaks Boulevard because of the requirements for the freeway and that plaintiffs' property could not be subdivided if there was no access from Fair Oaks Boulevard. In response to numerous pleas of plaintiffs and their agents that this situation created an intolerable dilemma, state officials did not assure plaintiffs that access would be restored by construction of the access road contemporaneously with the freeway or that the road would be built at public expense. Instead, they merely suggested that plaintiffs consult their attorney regarding the possibility of acquiring access from Cheryl Lane. Thus, the state implied that it concurred in the county's determination that plaintiffs were not entitled to access from Fair Oaks Boulevard because of the impending freeway project. In these circumstances, plaintiffs would suffer a manifest injustice if the state were allowed at this late date to avoid liability for the consequences of its conduct on the ground that the county's denial of access was based upon an erroneous interpretation of the law.[4]

■ We find no merit in the state's assertion that the statute of limitations had lapsed on plaintiff's claim. From 1968, when the amount of plaintiffs' land needed for the freeway was first established, the state changed the freeway plan to depict a frontage road providing access to plaintiffs' property from the freeway, offered to buy the land under the hardship program but without offering severance damages, and represented to plaintiffs that acquisition of their land would occur in 1972. Plaintiffs and their agents made numerous and aggressive attempts to sell the property, devising several alternative solutions to avoid the obstacles created by the freeway project. Finally, early in 1973, a realtor who had made repeated attempts to interest buyers in the property notified plaintiffs that he could not find a buyer because of the lack of access, and he suggested that they consult an attorney. They filed a claim in June 1973 (Gov. Code, §§ 901; 905.2, 911.2) and this action in September of that year.

In view of the state's course of conduct, plaintiffs' action was not barred by the statute of limitations. (Cf. *Pierpont Inn, Inc.* v. *State of California* (1969) 70 Cal.2d 282, 293 [74 Cal.Rptr. 521, 449 P.2d 737]; *Mehl* v. *People*

---

[4]It is true that state officials told plaintiffs that they did not object to development of the property. However, since there was no access for subdivision, such reassurance was of no comfort to plaintiffs or to any potential purchaser from plaintiffs.

ex rel. *Dept. Pub. Wks.* (1975) 13 Cal.3d 710, 716-717 [119 Cal.Rptr. 625, 532 P.2d 489].)

The state's contention that the trial court erred in awarding plaintiffs attorney's fees also lacks merit. As a general rule, attorney's fees may not be awarded in the absence of a statute or contract allowing such recovery. (*Reid* v. *Valley Restaurants, Inc.* (1957) 48 Cal.2d 606, 610 [311 P.2d 473].) Under section 1036 of the Code of Civil Procedure, a plaintiff in an inverse condemnation action is entitled to attorney's fees "for the taking of any interest in real property."

■ The state maintains that the deprivation of access did not amount to a "taking" and therefore attorney's fees could not properly be awarded under the section. We have recently held that the withdrawal of lateral support amounts to a taking of an interest in land under section 1036 (formerly § 1246.3), reasoning that the section connotes a more expansive concept of taking than that set forth in the Constitution. (*Holtz* v. *San Francisco Bay Area Rapid Transit Dist.* (1976) 17 Cal.3d 648, 654 [131 Cal.Rptr. 646, 552 P.2d 430].) The deprivation of an easement of access is as much a taking of an interest in land as the denial of a right to lateral support. Accordingly, the trial court did not err in awarding attorney's fees to plaintiffs.

We come, then, to the effect of the abandonment of the freeway project by the Legislature in 1975, several months after judgment was rendered. We are not precluded from taking cognizance of the Legislature's action, since under subdivision (c) of section 452 of the Evidence Code a court may take judicial notice of the official acts of the Legislature. Thus, we cannot close our eyes to the pragmatic effects of the abandonment of the freeway. It does not follow, of course, that plaintiffs were not harmed by the state's conduct during the time access was denied. ■ A landowner is entitled to compensation for a substantial impairment of his temporary right of access. (*City of Los Angeles* v. *Ricards, supra,* 10 Cal.3d 385, 387-388.) However, since the damages assessed here were awarded upon the assumption that plaintiffs' land had diminished in value because it was permanently deprived of access from Fair Oaks Boulevard, and access was restored by deletion of the freeway project, the amount awarded must be adjusted accordingly.

■ We reject the state's assertion that plaintiffs are not entitled to any damages because they did not realize a loss on the property by selling it at its diminished value. *City of Los Angeles* v. *Ricards, supra,* 10 Cal.3d 385,

does not hold that property must always be sold at a loss in order to recover damages for denial of access. In *Ricards,* the city destroyed a private bridge over which the plaintiff held an easement and which constituted the sole legal access to her property, and she remained without access until a bridge was reconstructed two years later. In the interim, the city refused to admit liability for the destruction of access or to commit itself to replacement of the bridge.

We recognized the rule that substantial impairment of access by a governmental entity entitles a property owner to compensation, but held that, because after replacement of the bridge the value of the property was as high as it would have been had no impairment occurred, and because there was no showing that any interim use would have been made of the property in the two years during which access was denied, the plaintiff had suffered no loss. We determined also that the plaintiff could have sold the property at a lesser price during the period access was denied and that then she would have been entitled to recover from the city the amount by which the selling price was reduced because of the impairment of access.

In the present case, by contrast, plaintiffs pursued every means at their disposal to sell the land for subdivision but were thwarted in their efforts because of the lack of access. There was ample evidence that if access had not been denied, the property was saleable for subdivision purposes.[5] Thus, it cannot be said, as in *Ricards,* that the landowner suffered no "financial disadvantage with respect to possible interim sale of the property." (10 Cal.3d at p. 389.) Moreover, here, unlike *Ricards,* plaintiffs were assured by state officials that they would be compensated for the property taken for the freeway, and from 1969 onward, state officials represented that access would be restored by construction of the frontage road. In view of these circumstances, the state's assertion that plaintiffs are not entitled to damages for loss of access during the period in question because they failed to realize their loss is without merit.

The judgment is reversed, and the matter is remanded to the trial court for determination of damages sustained by plaintiffs from February 1967,

[5]This case is also distinguishable from *City of Los Angeles* v. *Lowensohn* (1976) 54 Cal.App.3d 625 [127 Cal.Rptr. 417], in which it was held that no precondemnation damages were shown because the landowner had not established an actual loss in rental income or sales as a result of the government's activity. As pointed out above, plaintiffs' inability to sell their land was directly due to the lack of access.

when the subdivision map was disapproved, until 1975, when the freeway project was abandoned.[6] Plaintiffs shall receive their costs on appeal.

Bird, C. J., Tobriner, J., Clark, J., Manuel, J., Newman, J., and Rattigan, J.,* concurred.

---

[6]We note that plaintiffs stipulated before trial that they would waive the costs incurred by them in holding the property if the trial court would fix the valuation date at May 16, 1973, and that the court accepted this stipulation subject to reconsideration. Since a reassessment of the damages is required on the basis of restoration of access, plaintiffs are not to be bound by this stipulation.

*Assigned by the Chairperson of the Judicial Council.