[Civ. No. 59058. Second Dist., Div. Five. Dec. 14, 1982.]

CITY OF LOS ANGELES, Plaintiff and Appellant, v.
PROPERTY OWNERS, Defendant and Respondent.

[Civ. No. 60702. Second Dist., Div. Five. Dec. 14, 1982.]

CITY OF LOS ANGELES, Plaintiff and Appellant, v.
MARJORIE A. CRUM et al., Defendants and Respondents.

**COUNSEL**

Ira Reiner, City Attorney, James H. Pearson, Senior Assistant City Attorney, and James L. Spitser, Assistant City Attorney, for Plaintiff and Appellant.

Fadem, Berger & Norton and Michael M. Berger for Defendants and Respondents.

**OPINION**

**HASTINGS, J.**—The City of Los Angeles (appellant or the City) appeals from a judgment awarding *Klopping* damages in the form of interest in the amount of

$268,500, attorneys fees of $104,000, appraiser's fees of $20,000 and miscellaneous costs of $9,805 to Property Owners (respondents or Property Owners).[1]

On August 21, 1968, the board of airport commissioners passed a resolution to condemn respondents' property except for three parcels. The City announced at this time that an intercontinental airport would be opened in Palmdale at the site of respondents' property. The Los Angeles Council adopted an ordinance of condemnation on February 4, 1969. Subsequently, the board of airport commissioners passed another resolution of condemnation that included the three parcels excepted in the initial resolution.

Eminent domain proceedings were filed on September 1, 1972. Prior to this time respondents had filed their action against the City for damages for inverse condemnation.

By September 1, 1974, the City had served the summons and complaints in eminent domain on the respondents except for the owners of the three properties originally excluded.

All actions were consolidated and on February 2 to February 10, 1977, the trial of certain legal issues was held before the Honorable Alexander R. Early III. The principal legal issues to be decided at this bifurcated trial were whether there had been a de facto taking of respondents' property and whether they were entitled to *Klopping*[2] damages. The subsequent trial before a jury would determine the value of the property taken under the eminent domain proceedings.

On May 17, 1977, Judge Early rendered his interlocutory judgment in which he found there was no de facto taking by appellant of any of respondents' parcels but there had been an unreasonable delay by appellant in its acquisition of all but three of respondents' properties. With respect to *Klopping* damages arising from the unreasonable delay he ruled that evidence on this issue could be presented to the jury where it related to respondents' attempts and subsequent inability to sell their respective properties or their inability to rent or to use or develop their properties.

Approximately three weeks after Judge Early made these rulings, respondents moved to disqualify Judge Early from hearing the case, on the grounds stated in Code of Civil Procedure section 170, subdivision (5). Thereafter,

---

[1]The Property Owners are a group of individuals that owned approximately 230 parcels of unimproved real property in the Palmdale area outside the city limits of Los Angeles but in Los Angeles County.

[2]See *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345].

Judge Early filed his consent to transfer the trial and it was assigned for all purposes to Judge William A. Caldecott.

Judge Caldecott ruled that he would reopen the legal issues concerning the de facto taking and *Klopping* damages, but would withhold his decisions on these issues until after the jury trial resolving the fair market value of the various parcels of property.

The jury trial was held covering 32 of respondents' properties. The jury set the total fair market value for said parcels as of September 1, 1972, at $671,250. Prior to trial, appellant's fair market value appraisals for the 32 parcels totalled $488,750. Its final offer for said parcels totalled $634,375. Respondents' fair market value appraisals for the same property totalled $1,017,000 and their final demand was $913,148.

Following the jury trial Judge Caldecott issued his rulings and judgment. He awarded the respondents interest at the legal rate on the amount of their fair market value awards from August 28, 1972, to the date of payment into court of those awards, based upon a so-called de facto taking of respondents' properties. The interest was referred to as *Klopping* damages.

Respondents filed their memorandum of costs and disbursements and appellant filed its motion to tax costs. Respondents also filed a motion for award of litigation costs pursuant to Code of Civil Procedure section 1249.3 along with a supplement to that motion. Appellant filed its supplement to motion to tax costs.

Due to the untimely death of Judge Caldecott, the hearing concerning costs and award of litigation costs pursuant to section 1249.3 was assigned to Judge Harry R. Hupp. He ruled that with respect to the 32 parcels respondents were entitled to attorneys fees, appraiser's fees and litigation costs in amounts to be determined later. Subsequently, Judge Hupp awarded respondents attorneys fees in the sum of $100,000, appraiser's fees in the sum of $20,000 and miscellaneous costs of $9,805.04. In a second order after judgment, Judge Hupp awarded respondents an additional $4,000 in attorneys fees.

### APPELLANT'S ISSUES ON APPEAL

1. Can the actions of appellant constitute a de facto taking of respondents' properties?

2. Are respondents entitled to receive *Klopping* damages arising from an "unreasonable delay" by appellant in the acquisition of respondents' properties in the form of interest added to value of the property taken?

■ 3. If there was no de facto taking of respondents' properties and respondents are not entitled to receive any *Klopping* damages, are respondents entitled to receive attorneys fees, appraiser's fees and miscellaneous costs pursuant to Code of Civil Procedure section 1249.3 (now Code Civ. Proc., § 1250.410) and Code of Civil Procedure section 1246.3 (now Code Civ. Proc., § 1036)?

## DISCUSSION

Judge Caldecott recognized that he was stepping into virgin territory with his two rulings on a de facto taking and award of damages. In reference to his decisions he stated with unusual candor:

"But the fact is that all development in the whole area has been stalled by the stalling of the airport . . . .

". . . there was a substantial stalling by the failure of the City to employ the next backup to properly take over and purchase all of the lands that they wanted to take . . . .

"Along this line there is no doubt that the properties that are involved in this litigation—as far as I know that is probably true with all the remaining parcels of land, is that prior to the taking there was no rental market, there was no sales market.

"They can't contend that they lost rentals because they never had any rentals.

"They have, however, continued to have holding costs by way of frozen assets, taxes, items of that kind that they were bearing while the City proceeded to acquire their property.

"*It does not appear to me to be Klopping damage in the sense specifically covered by the Klopping case.*

"*It may not be a 'de facto taking.'*

"The whole problem lies some place in between these two.

"I cannot help but feel that the proper ultimate decision is to allow the property owners to recover interest on their judgments from the date of valuation in this case.

" . . . . . . . . . . . . . . . . . . . . . .

"But I don't know of any case really like it. I am aware, of course, of *Stone* [*Stone* v. *City of Los Angeles* (1975) 51 Cal.App.3d 987 (124 Cal.Rptr. 822)] and *Lowensohn* [*City of Los Angeles* v. *Lowensohn* (1976) 54 Cal.App.3d 625 (127 Cal.Rptr. 417)]. In each instance there were different facts and different findings by Courts.

"The Appellate Courts determined to go along with whatever a trial judge determines factually.

"I want to put my findings on both grounds, *Klopping* and de facto taking, because I don't know which category could best be supported." (Italics added.)

Appellant, encouraged by Judge Caldecott's statements, claims the judge's doubts would have been resolved in its favor had he considered more carefully *City of Los Angeles* v. *Waller* (1979) 90 Cal.App.3d 766 [154 Cal.Rptr. 12]. The central facts of *Waller* are quite similar to those of our present case. Other property owners owned 35 acres in the same airport land acquisition project as the instant case. By way of cross-complaint to the eminent domain proceedings these owners sought inverse condemnation damages. The trial court found no de facto taking. The appellate court in affirming made numerous pertinent comments which are as follows: "We perceive in eminent domain cases—or 'just compensation' cases—various degrees of culpability on the part of the public entity which entitle condemnees to an escalating amount of relief, depending upon the determination of the degree. Unusually oppressive conduct results in a determination of 'de facto taking' while *delay* is answerable in proximately caused damages. What constitutes oppression, or direct and substantial impairment of property rights by the condemner, is essentially a factual question, one determinable on a case-by-case basis. In the case at bench, the trial court concluded that a de facto taking had not been established, although there was unreasonable delay which could be considered by the jury during the valuation phase of the proceedings.

"We agree with the trial court, particularly in view of the fact that there was substantial testimony that the subject property's highest and best use was as an investment, to be held until such time as its value had increased. Defendants did not demonstrate that the conduct of the condemner defeated this highest and best use, nor was it demonstrated that the condemner substantially impaired defendants' property rights. A recent case, *Jones* v. *People* ex rel. *Dept. of Transportation* (1978) 22 Cal.3d 144 [148 Cal.Rptr. 640, 583 P.2d 165], affirmed a judgment for *damages* because the public entity destroyed—temporarily at least—access to the subject property, a far more extreme situation than that presented here. The contrast persuades us that no de facto taking occurred in the case before us." (90 Cal.App.3d at p. 778.)

The keystone case of course is *Klopping* v. *City of Whittier; supra,* 8 Cal.3d 39. The opinion contains an analysis of "just compensation" that must be paid to property owners in condemnation cases. The standard for "just compensation" is measured by the market value of the property, which is the highest price estimated in terms of money which the land would bring if exposed for sale in the open market. Precondemnation activity concerning the property can in certain instances enhance the market value of the property or it can decrease the market values of the properties involved.

In *Klopping* the property owners claimed the fair market value of their properties had declined as a result of the defendant's two announcements of intent to condemn made prior to instituting eminent domain proceedings. They contended they were unable to fully use their properties and that this damage was reflected in the loss of rental income. The City of Whittier maintained the property owners were not entitled to recover for losses caused by the precondemnation announcements because there was no physical invasion of plaintiffs' lands nor any direct interference with their possession and enjoyment of their lands which is necessary under a de facto taking theory. The *Klopping* court accepted the argument of the City of Whittier stating there was no de facto taking because there was no "physical invasion or direct legal restraint" to support a "taking" before the date set by statute. (Code Civ. Proc., § 1249.) The court then turned to the other issue before it; namely, whether unreasonable delay *after* public precondemnation statements was compensable to the property owners. It recognized that delaying tactics could affect the market value of the property and concluded, "Accordingly we hold that a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question *suffered a diminution in market value.*" (8 Cal.3d at p. 52; italics added.)

The *Klopping* opinion thus emphasizes that damages in such a situation must be measured in terms of increasing or decreasing market values to the property involved.

CONCLUSION

We conclude that the facts of our present case do not establish a de facto taking and the award of damages was error. There was no oppressive conduct, as defined in *Klopping* and *Waller, supra,* 90 Cal.App.3d 766, to support the de facto allegations. Although Judge Early's rulings are not before us on this appeal, and they do not influence us one way or the other, he was correct concerning damages in such a situation. He stated: "With respect to the damages, if any, for said delays evidence of actual damage to said owners may

be received arising from their inability to sell their properties after the date of their probable inclusion within the airport project, and of their inability to rent or to use or develop their said properties during said periods of unreasonable delay. Regarding the admissibility of such evidence, the court is bound by and will follow the opinion of the appellate court for this district in *City of Los Angeles* v. *Lowensohn*, (1976) 54 Cal.App.3d 625 (hearing denied)."[3]

Here, as in *City of Los Angeles* v. *Waller, supra,* 90 Cal.App.3d 766, it was conceded by respondents that their properties' highest and best use was as an investment to be held until such time as its value had increased. As in *Waller, supra,* respondents did not demonstrate that the conduct of appellant defeated the highest and best use of their properties nor was there any proof that the acts of appellant substantially impaired their property rights thus affecting the properties' market value. Instead, the damages were awarded by the court on an entirely new theory; namely, that the "Property Owners have had to bear the cost of real property taxes, the loss of use of the value of their assets, and the loss of their ability to sell their land and use of the proceeds as they chose since August 21, 1968."

■ Our reversal of the award of damages necessitates a reversal of the awards to appellants for attorney's fees, appraiser's fees, and miscellaneous costs. Judge Hupp recognized that these fees and costs were grounded solely on the award of the so-called *Klopping* damages. He made findings of fact relative to this issue, which correctly state the law in such a situation. They are as follows: "6. If Judge Caldecott had not awarded the Property Owners legal interest from August 28, 1972, until the date that the fair market value of their respective properties is paid into Court for their benefit, based primarily on a 'de facto' taking and secondarily on *Klopping* damages, then the Final Offers and Final Demands filed herein by the City and the Property Owners, respectively, would have been limited to offers and demands with respect to the issue of the fair market value of each subject property. As a result, the Property Owners would not be considered successful litigants in an inverse condemnation proceeding for the taking of an interest in their respective real properties. In addition, in making the required comparisons, pursuant to C.C.P. § 1249.3, to determine the reasonableness of the City's Final Offers and the Property Owners' Final Demands, said Final Offers and Final Demands would be compared by the Court only with the Fair Market Value of the respective subject properties as awarded by the jury.

"7. As compared with the fair market value of the respective subject properties as awarded by the jury, the 'City of Los Angeles' Final Offers' and

---

[3]Judge Caldecott based his award of damages primarily on "holding costs" paid by appellants. In *Lowensohn,* we held that evidence of such costs was inadmissible in a similar situation.

'Amended Final Offers', filed on April 26, 1978, and May 3, 1978, respectively, were reasonable, and the 'Property Owners' Offers to Settle Under C.C.P. § 1249.3' and 'Amended Offers to Settle Under C.C.P. § 1249.3', filed on April 26, 1978, and May 1, 1978, respectively, were also reasonable."[4]

The judgments are reversed.

Stephens, Acting P. J., and Ashby, J., concurred.

A petition for a rehearing was denied January 11, 1983, and respondents' petition for a hearing by the Supreme Court was denied March 2, 1983. Kaus, J., did not participate therein. Mosk, J., and Richardson, J., were of the opinion that the petition should be granted.

---

[4]Former Code of Civil Procedure section 1249.3: "At least 30 days prior to the date of trial, plaintiff shall file with the court and serve a copy thereof on defendant its final offer to the property sought to be condemned and defendant shall in like manner, file and serve a copy thereof on plaintiff his final demand for the property sought to be condemned. Service shall be accomplished in the manner prescribed by Chapter 5 (commencing with Section 1010) of Title 14 of Part 2.

"If the court, on motion of the defendant made within 30 days after entry of judgment, finds that the offer of the condemnor was unreasonable and that the demand of condemnee was reasonable, all viewed in the light of the determination as to the value of the subject property, the costs allowed pursuant to Section 1255 shall include all expenses reasonably and necessarily incurred in preparing for and in conducting the condemnation trial including, and not limited to, reasonable attorney's fees, appraisal fees, surveyor's fees, and the fees for other experts, where such fees are reasonable and necessarily incurred to protect defendant's interest prior to trial, during trial and in any subsequent judicial proceedings in the condemnation action.

"In determining the amount of attorneys fees and expenses to be awarded under this section, the court shall consider written, revised or superseded offers and demands served and filed prior to or during the trial."