[No. A044958. First Dist., Div. Four. Feb. 26, 1990.]

CHARLES GILBERT et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

**COUNSEL**

Ronald A. Zumbrun, Orrin F. Finch and Richard M. Stephens for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Charlton H. Holland, Assistant Attorney General, Stephanie Wald and Angela Botelho, Deputy Attorneys General, for Defendants and Respondents.

OPINION

ANDERSON, P. J.—Charles Gilbert and others (appellants)[1] appeal from a judgment of dismissal following the sustaining of a demurrer without leave to amend in favor of the Department of Health Services and related defendants (collectively Department).[2] We agree that appellants failed to state any cause of action against the Department and affirm the judgment.

## I. FACTUAL AND PROCEDURAL SUMMARY

Appellants own unimproved real property within the territory served by the Bolinas Community Public Utility District (District). In November 1971, in response to a water shortage emergency condition, the District enacted a water moratorium on new or additional service connections. For several years thereafter the District affirmed continuation of the emergency, and in 1977 declared a continuing water shortage emergency. At that time the District also promulgated continuing prohibitions and restrictions on new or additional service connections as well as expansion or modification of existing service.

In 1982 the District applied to the Department for a permit to operate its existing water system and to make improvements. The Department's sanitary engineering branch then reviewed the District's system and recommended that the Department grant a new permit subject to the condition that the District continue its existing moratorium on service connections "until additional water sources are developed and/or an adequate supply is demonstrated to the satisfaction of the Department." The Department followed this recommendation and, accordingly, conditioned the District's new permit. Today, the moratorium apparently is still in effect.

Unable to improve their property because of the moratorium, appellants filed an action in 1987 against the Department and the District, directing five causes of action against the Department.[3] The Department demurred successfully to all causes filed against it; the court granted appellants 30 days' leave to amend.

The second time around appellants added two new causes of action against the Department and made minor changes to the existing causes. The

---

[1] Appellants herein are landowners Charles and Phyllis Gilbert, Matthew Lockary and Susan Irland Lockary, and James Macey.

[2] Respondents herein are the State of California, the Department of Health Services and Kenneth Kizer, in his official capacity as its Director.

[3] Specifically, appellants sought to compel the Department to remove the continued moratorium condition and to develop additional water sources, and prayed for declaratory relief on the existence of a duty to supply water. An additional cause sought damages for inverse condemnation and declaratory relief on the issue of entitlement to compensation.

Department again demurred, reiterating the same grounds and arguments developed in the original demurrer, and further arguing that the two "new" causes were but recycled statements of issues already aired and rejected, and the revamped causes were virtually identical to those set forth in the first complaint.

The court sanctioned appellants and their attorneys for filing a frivolous amended petition and complaint, and upheld the Department's demurrer without leave to amend. This appeal followed the judgment of dismissal with prejudice as to the Department. (We note that appellants' challenge to the validity of the *District's* moratorium and the *District's* denial of their service connections was not the subject of a demurrer and presumably is proceeding to trial below.)

## II. DISCUSSION

The trial court sustained the Department's demurrer to appellants' first, second, third and seventh causes of action on the grounds they (1) were barred by the applicable statute of limitations and (2) failed to state facts sufficient to constitute a cause of action. ■ ■■■ As to the second ruling, the court explained that the agency's power to act in the matters asserted is discretionary and thus, mandamus is not available to compel it to exercise this discretion in any particular way.[4] Further, the court sustained demurrers to the ninth and tenth causes (inverse condemnation and entitlement to compensation) on the ground that the alleged facts did not constitute a taking under California law. We conclude that the court below correctly determined the amended petition and that the complaint did not state any cause of action against the Department; we do not reach the merits of the statute of limitations defense.

### A. *Standard of Review*

■ In testing the sufficiency of a complaint against demurrer, we treat the demurrer as admitting the truth of all material factual allegations in the complaint (*Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 493 [220 Cal.Rptr. 818, 709 P.2d 837]; *Mautner* v. *Peralta* (1989) 215 Cal.App.3d 796 [263 Cal.Rptr. 535]) but ignore allegations of conclusions of law (*Executive Landscape Corp.* v. *San Vicente Country Villas IV Assn.* (1983) 145 Cal.App.3d 496, 499 [193 Cal.Rptr. 377]). Further, we may read the

---

[4] The third cause of action is for declaratory relief, not mandamus. We conclude, for reasons specific to the elements of a declaratory relief action, that appellants have failed to state a cause of action. On appeal, we review the correctness of the lower court's decision, not its rationale. (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117]; *Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 211 [223 Cal.Rptr. 645].)

complaint as including matters which may be judicially noticed.[5] (Code Civ. Proc., § 430.30, subd. (a); *Lazzarone* v. *Bank of America* (1986) 181 Cal.App.3d 581, 590 [226 Cal.Rptr. 855].) The noticed material may show the complaint fails to state a cause of action although the bare allegations do not disclose this defect. (*Ibid.*)

### B. *Mandamus Actions*

■ Code of Civil Procedure section 1085 permits a court to issue a writ of mandate to compel an act which the law specially enjoins. Mandate will lie where the respondent has a clear, present and usually ministerial duty and the petitioner has a clear, present and beneficial right to performance of that duty. (*Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 863 [132 Cal.Rptr. 464, 553 P.2d 624]; *McClure* v. *County of San Diego* (1987) 191 Cal.App.3d 807, 811 [236 Cal.Rptr. 653].) However, a petitioner cannot invoke mandamus to control the discretion of an administrative agency or officer. Thus, while under appropriate circumstances a court may force an agency to act by exercising its discretion, it will not compel an agency with discretionary power to act in any particular manner. (*Id.*, at p. 812.) Stated differently, a court will not "substitute its discretion for the discretion properly vested in the administrative agency." (*Lindell Co.* v. *Board of Permit Appeals* (1943) 23 Cal.2d 303, 315 [144 P.2d 4].)

### (1) *First Cause of Action*

Health and Safety Code[6] section 4010 et seq. sets forth the procedures and requirements governing the issuance of water permits to water districts. This statutory scheme (1) specifies the operator's responsibility to petition for a permit (§ 4011); (2) sets forth the Department's investigative responsibilities when it receives a permit application (§ 4013); and (3) requires the Department to issue or deny the permit upon completing its investigation (§ 4014 [derivation: former §§ 4015 and 4016, which respectively (1) detailed the grounds for denying a petition and (2) specified the circumstances under which the Department must grant the permit]).

---

[5] Having afforded the parties opportunity to present information relevant to our proposal to take judicial notice of certain matters, we now take notice of the following items which appellants filed with their amended petition under the heading "Administrative Record": (1) Resolution No. 173 enacted by the District on July 20, 1977; (2) Water Permit No. 82-051 issued by the Department to the District on November 5, 1982; and (3) Engineering Report in the Matter of the Permit Application from Bolinas Community Public Utility District, prepared by the Department's Sanitary Engineering Branch in August 1982 (Engineering Report). (Evid. Code, §§ 452, subds. (c), (d); 455, subd. (a); 459, subds. (a), (c).) Our judicial notice of these official acts goes to the authenticity and contents of the documents, not to the absolute truth of their contents.

[6] Unless otherwise indicated, all further statutory references are to the Health and Safety Code

Former section 4016 governed the Department's actions at the time it issued the District's permit and provided that the Department *shall* grant a permit authorizing petitioner to furnish or continue furnishing water if it determines, among other matters, "that the water to be furnished or supplied is such that under all the circumstances and conditions it is pure, wholesome, and potable and will not endanger the lives or health of human beings . . . ." In the case of the District's petition, the Department found, after investigation, that the water system with proposed improvements would satisfy all statutory requirements, and then granted the permit with the proviso that the District should continue its existing moratorium until it develops further sources and/or demonstrates an adequate supply.

■ The first cause alleges that upon its determination that the District's system could comply with all statutory requirements, the Department has a "nondiscretionary duty to issue its permit without restricting or preventing additional water service connections to the system," and seeks to compel the Department to remove the continued moratorium condition from the permit. The heart of this first cause is the assertion that the Department acted in excess of its statutory authority in so conditioning the permit after determining that the water and system met the appropriate standards.

Appellants contend that, depending on the outcome of the investigation and resulting findings, the Department was empowered to either deny the petition and order changes, or grant the petition without further qualification. The "hybrid" permit which issued herein, they contend, was not allowed under the existing statutory scheme.

The Department counters that it has always had full authority to impose conditions on a water permit,[7] including conditions relating to quantity, and, thus, appellants cannot succeed in forcing the Department to rescind the condition and issue an unrestricted permit. In 1982 when the Department issued the permit, it had authority to order any "measure necessary to insure that . . . the water furnished or supplied shall at all times be pure, wholesome, and potable and without danger to the lives or health of human beings." (Former § 4017, repealed by Stats. 1985, ch. 758, § 1, p. 2432.) Surely, this provision gave the Department discretion to safeguard water quality in any manner it saw fit, including by way of attaching conditions to a water district's operating permit. The statute did not specify the form of

---

[7] We note that commencing January 1, 1990, the Department's authority to condition permits has been explicit. Section 4014 provides in pertinent part: "The department may impose such conditions, requirements for system improvements, and time schedules as it deems necessary to assure a reliable and adequate supply of water at all times which is pure, wholesome, potable, and does not endanger the health of consumers." (Added by Stats. 1989, ch. 823, § 18.)

orders or otherwise suggest that conditions would be an inappropriate means of ensuring potability and safety.[8]

Appellants raise several objections to this analysis.

(a) *1985 Revisions:* First, they claim that the District's broad interpretation of former section 4017 renders subsequent enactments meaningless. Specifically, they point out that although the 1985 enactments gave the Department express authority to prohibit new service connections (§ 4033, subd. (b)(4) added by Stats. 1985, ch. 758, § 11, p. 2434), that authority can only be exercised in the context of determining that a district has violated its permit or governing statutes and regulations (§ 4033, subd. (a)). Further, they argue that section 4032 (added by Stats. 1985, ch. 758, § 9, p. 2433) also tempers the Department's power to issue preventive action orders by providing for a formal citation procedure in the face of such violations.

Appellants' conclusions go too far. Although the Legislature repealed former section 4017 in 1985, nothing in the statutory reorganization voided acts which the Department took pursuant to powers previously granted by that provision. Moreover, section 4033 reenacted much of the substance of former section 4017. (See West's Ann. Health & Saf. Code (1989 pocket supp.) § 4033, p. 298, Derivation.)

(b) *Quantity Versus Quality:* Second, appellants contend the Department can only regulate water quantity to the extent quantity affects quality, and its action here fell outside this limitation. They cite a 1974 Attorney General opinion construing the term "continuous supply" as used in a statute repealed two years later which delineated grounds for denying a petition for permit.[9] The opinion responded to inquiries concerning whether the "continuous supply" language referred to quality of water or quantity to be supplied, and whether the entity making the permit decision should consider possible changes in water quality given a likelihood of overdrafting the water source. The Attorney General concluded: "Overdrafting refers to the quantity of water available and should not be considered in determining

---

[8] Former section 4018 (repealed by Stats. 1985, ch. 758, § 3, p. 2432) provided that specific orders requiring repairs, alterations, additions or changes were to designate the timeframe for performance. Appellants emphasize that the Department did not comply with this mandate when it conditioned the permit. This is nonsense. A measure requiring *continuance* of a moratorium is not an order mandating repairs, alterations or additions, or changes such as would require a performance deadline.

[9] The provision in question provided that if, upon completing the background investigation, the responsible state agency made certain determinations about water quality it must ". . . deny the petition and order the petitioner to make such changes as it deems necessary *to secure a continuous and adequate supply* of pure, wholesome, healthful, and potable water." (Former § 4016, repealed by Stats. 1976, ch. 1087, § 1, p. 4908, italics added.)

whether a small water permit should be granted or denied, unless the quality of the water is considered affected by the use of the water by the permittee." (*Health and Safety Code—Water—"Continuous Supply" and Overdrafting,* 57 Ops.Cal.Atty.Gen. 472 (1974).) This opinion involved the question whether to grant or deny a small water permit. Note that here, the Department *granted* the permit.

We certainly agree that the Department is in the primary business of overseeing water quality, not regulating water quantity or water rights. But the Attorney General opinion is not the last word on the scope of the Department's authority in this case. As we discuss below, by mandate the Department concerns itself with quantity of supply in fulfilling its function of safeguarding the safety of that supply. We conclude the legislative and regulatory scheme recognizes an inherent connection between quality and quantity and gives the Department latitude to consider quantity and service expansion in the permit review process. It follows that pursuant to this review, the Department may also impose service expansion conditions on a district's permit.

When the Department receives a proposal for a new or amended petition, it must thoroughly investigate *all* material circumstances and conditions, including the water supply. (§ 4013.) Moreover, at the time it issued the District's permit, the Department was required to take into account *all* the circumstances and conditions when making its determination of purity and potability. (Former § 4016.) Further, the Department has authority to promulgate regulations governing the execution of its duties (§ 108) and in this regard it periodically enacts California Waterworks Standards.[10] These standards require that "[s]ufficient water shall be available from the water sources and distribution reservoirs to supply adequately, dependably and safely the total requirements of all users under maximum demand conditions *before agreement is made to permit additional service connections to a system.*" (Cal. Code Regs., tit. 22, § 64562, subd. (a), italicized material added by amendment in 1985.) Finally, the standards provide that requirements for the public water system shall be determined from total source capacity, storage volume and number of service connections, and set forth procedures for determining needed source capacity and needed storage volume. (Cal. Code Regs., tit. 22, §§ 64562, subd. (c)(1), 64564.)

Turning to the facts here, we reiterate that prior to issuing the permit, the Department's sanitary engineering branch investigated the District's system and issued the Engineering Report summarizing this effort. This

---

[10]Section 4010.1, subdivision (h), defines "waterworks standards" as regulations which the Department adopts, taking into account the most recent standards adopted by the California section of the American Water Works Association.

background report reviewed the system's consumption and supply requirements and water sources, as well as the storage and distribution systems, and concluded that the system could not support additional connections "until a satisfactory source supply is demonstrated." As is evident from the permit, the Department made the statutory finding that all standards could be met *with reference to* "the water system with the proposed improvements." This was a system servicing a limited number of connections, whose governing body had instituted a moratorium on new hookups. Thus, the continued moratorium proviso was not a new condition which the Department unilaterally imposed on the District; rather, it was an action which responded to the existing system and circumstances which the Department had investigated.

We conclude under both current law and that in effect when the permit issued, the Department had discretion to order districts to take measures to comply with water standards, including measures designed to take into account the availability of sufficient water to meet maximum demand for current users. Within this scope of permissible authority, the Department had discretion to require the District to continue its moratorium on additional connections pending development of an adequate water supply. Appellants cannot use the courts to compel the Department to rescind the condition when it had discretion to impose it in the first instance.

(c) *Water Code Provisions Governing Moratoria:* Third, appellants contend the Department lacked authority to institute a moratorium because the Water Code explicitly grants such authority only to the District. True, under Water Code sections 350 and 353, only the governing body of a public water supply can declare a water shortage emergency condition and enact regulations and restrictions pursuant thereto. However, it was not the Department which enacted the moratorium. It was in place when the District petitioned for an amended permit, and the District has not attempted to make any showing which would justify removing the Department's proviso.

Moreover, the permit condition tracks existing legal requirements governing the District. Water Code section 353 requires the governing body declaring a water shortage emergency to adopt regulations and restrictions on water delivery and consumption. Water Code section 355 mandates that these regulations and restrictions "shall thereafter be and remain in full force and effect during the period of the emergency and until the supply of water available for distribution within such area has been replenished or augmented."

Here, in keeping with its responsibilities under the Water Code, the District enacted prohibitions and restrictions on new or additional water

service connections. These regulations and restrictions by law must remain in effect throughout the duration of the emergency *and* until the water supply is augmented or replenished. The Department's permit condition in effect is nothing more than the assertion that it wants proof of compliance with existing law. This is not unreasonable, and is not an abuse of its authority.

Appellants would have us believe that they are in a no-win situation, with both agencies pointing the finger of responsibility at the other. The District is not bound in perpetuity to maintain the moratorium. It can drop the moratorium, and get out from under the condition, by meeting the requirements of Water Code section 355.

(d) *Regulation of Consumers:* Appellants finally argue the moratorium is unrelated to quantity because existing users have unlimited access to water and the District has not enacted any delivery or consumption restrictions which would demonstrate some concern about the quantity. First, this is not factually correct. The 1977 resolution sets consumption limits for the expansion or modification of an existing service. Second, the Department cannot, and does not, regulate the consumer. This is the District's job, and what the District has done, or not done, is immaterial to the execution of the Department's duties when it investigated and granted the permit. Appellants have not attempted to allege any faulty analysis or procedures in connection with the engineering branch's investigation or report, or that the Department's reliance thereon constituted an abuse of discretion. The sole matter posed by the first cause of action is whether the Department has a nondiscretionary duty to issue the permit without conditions once it made the required potability determinations. We have determined no such duty existed, and mandate thus is not available to compel the Department to rescind the condition.

## (2) Second Cause of Action

■ The second cause of action alleges a present duty to investigate the District's system and determine whether conditions warrant continuation of the moratorium on new service connections. Appellants apparently premise this duty on the fact that the Engineering Report, which guided the Department's decision to grant the permit, stated: "Further investigation of source yield and consumption should be undertaken upon completion of repair of the distribution system." The cause states that the District completed repairs in December 1985, and the Department did not thereafter investigate source yield or consumption.

Of course, nothing in the Engineering Report indicates what entity should conduct such an investigation, nor has the statutory framework

required the Department to conduct any follow-up investigation such that mandamus would be appropriate to compel this effort. Section 4013 triggers the Department's duty to investigate only as preliminary to deciding whether to issue or deny the permit. The purpose of the investigation is to evaluate the merits of the proposed or existing plant, works, system and water supply. As part of its enforcement authority, section 4039, subdivision (a) *allows* the Department to inspect public water systems, records, test results and the like; monitor equipment; and obtain water samples. Section 4039, subdivision (b), amended since the filing and trying of this lawsuit, now *mandates* annual inspection of each public system. (Amended Stats. 1989, ch. 823, § 59, eff. Jan. 1, 1990.) The statute does not explain the scope of this annual inspection, but whether or not it would include investigating the system's source yield and consumption, obviously the Department has not violated this new duty and mandamus premised on subdivision (b) would be premature. The trial court properly sustained the demurrer to this cause of action.

### (3) *Seventh Cause of Action*

■ This cause seeks to force the Department and the District to develop additional water sources. The pleading alleges that the Department has ignored and avoided its duties "to exert every reasonable effort to locate, obtain, and distribute in a nondiscriminatory manner adequate quantities of potable water to meet the increasing needs of all owners and residents within [the District's] jurisdictional boundaries." By way of relief appellants ask the court to command the Department to properly exercise its discretion to compel the District to develop and implement a reasonable plan to augment the water supply. It is appellants' belief that if for any reason the Department had authority to impose conditions on the number of water connections, it had a corresponding duty to require the District to work in good faith to eliminate the moratorium.

In this regard they argue that if former section 4017 gave the Department power to order the moratorium, then former section 4018 required it to impose a reasonable timeframe to eliminate the need for the restrictions. As we stated above, the permit condition is not an affirmative order for repairs, alterations, additions or changes within the meaning of former section 4018; rather, it is an order directing the District to maintain the status quo until such time as it can demonstrate additional water sources or an adequate water supply. The very nature of the condition is such that the events which could trigger its demise may never come to fruition. Thus, while it would be appropriate to require repairs to a dilapidated distribution system to be performed within a specified timeframe, it would not be appropriate here to set any performance date. We all know that potable water is a finite resource in Northern California, and conceivably a water district affected by

periodic droughts could not, in the near future, eliminate the conditions which drove it to impose a moratorium in the first instance.

It is within the local district's province of authority to initiate plans and decisions about water supply, treatment, plant facilities, distribution systems and level of service. (See §§ 4011 and 4012.) The Department has no corresponding duty to prod districts into expanding their system, developing new sources, or the like. Likewise, it is up to the District, not the Department, to initiate changes, if it can, which will eliminate the need for the moratorium on service connections. The trial court properly cut off appellants' ability to proceed against the Department on this cause of action.

### C. *Declaratory Relief Action*

■ The third cause of action seeks declaratory relief on the issue of whether the moratorium condition on the 1982 permit might properly be removed because, under the permit, the Department ordered continuance of the moratorium on new service connections only "until additional water sources are developed and/or an adequate supply is demonstrated" to its satisfaction. Thus the pleading alleged the existence of an actual controversy "in that petitioners believe they can show that an adequate supply of water exists to require removal of the existing moratorium. . . ."

Declaratory relief is available "in cases of actual controversy relating to the legal rights and duties of the respective parties . . . ." (Code Civ. Proc., § 1060.) For appellants to state a cause of action for declaratory relief, there must arguably be a right (on their part) or a duty (on the Department's part).

Nothing in the statutory schemes gives third party landowners the right to demonstrate anything to the Department with respect to the District's permit. More importantly, whether or not appellants can demonstrate an adequate supply is irrelevant because the District has not applied for an amended permit. It is in the context of submitting an application for an amended permit that the District would present data concerning the advisability of a continued moratorium. (§ 4012.) There is no duty on the Department's part to consider removing the condition until the District seeks an amended permit.[11] Indeed, appellants seem to recognize this reality because the sixth cause of action against the District seeks to compel it to

---

[11] We note that recent amendments now give the Department *discretionary* power to revise or amend any domestic water supply permit "whenever the department deems it to be necessary for the protection of public health whether or not an application has been filed." (§ 4011, subd. (c), added by Stats. 1989, ch. 823, § 13, eff. Jan. 1, 1990.)

petition for an amended operating permit. Again, there was no error in upholding the demurrer to this cause of action.

### D. *Takings Claims*

 In their ninth and tenth causes of action, appellants ask for damages for a regulatory taking based on an inverse condemnation theory under the California Constitution. In addition, they request declaratory relief on the issue of their entitlement to compensation.

The complaint alleges that (1) the County of Marin (County) has zoned their properties "primarily for use as residential development" and all authorized uses require a supply of water; (2) the only practicable source of potable water is from a District water connection; (3) the County has informed them that until they can obtain water service from the District, they cannot obtain approval to make any economically viable use of their properties; and (4) no market exists for their properties because no buyer will purchase "so long as they are subject to the denial of water service by respondents." The trial court sustained the Department's demurrer, ruling that the facts alleged do not constitute a taking under California law.[12]

Article I, section 19 of the California Constitution provides in part: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." Our Supreme Court has laid down the basic requirements for pleading inverse condemnation: "In order to state a cause of action for inverse condemnation, there must be an invasion or appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specially affect the landowner to his injury." (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 119-120 [109 Cal.Rptr. 799, 514 P.2d 111]; *Pier Gherini* v. *California Coastal Com.* (1988) 204 Cal.App.3d 699, 713 [251 Cal.Rptr. 426].) The burden is on the owner to allege and prove the owner's

---

[12] Appellants attempt to misguide our analytic task by stating that the court ruled the California Constitution does not allow a claim for compensation, while "apparently" agreeing with their position that their "property had been taken." As appellants know, the court *ruled* that "the facts alleged do not constitute a *taking* under state law." (Italics added.)

At the hearing on the first demurrer, the court commented as follows: "The state has said there is no such damage because you don't have a right to a hookup, and the United States Supreme Court has made some rather startling pronouncement in this field of law that may cause our courts to rethink that. . . . [U]ltimately there may be a serious question about taking, because the de facto result of this open-ended moratorium is to make land worthless. That's no question about that."

Whatever these comments mean, the written ruling was clear—no taking under state law. It is that ruling which we review on appeal. Concluding there is no taking, we have no need to reach the compensation issue.

property right and its infringement. (*People* ex rel. *Dept. Pub. Wks.* v. *Romano* (1971) 18 Cal.App.3d 63, 72 fn. 4 [94 Cal.Rptr. 839].)

 The Department has contended all along that there can be no taking because under California law, appellants have no right to a water connection. Appellants repeatedly have attempted to distinguish the Department's authority on this proposition. Alternatively, they concede the property right issue but argue the real question is whether a regulatory taking can occur by wrongfully prohibiting a water connection, which action in turn deprives them of all economically viable use of their property. We first review decisional law on the property interest issue, and then proceed to examine appellants' alternative theory that regardless of the nature of their interest in a connection, the Department's action nonetheless constituted a constitutional taking.

### (1) *Rights of Actual versus Potential Water Users*

 Protected property interests are created and defined by state law. (*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 577 [33 L.Ed.2d 548, 561, 92 S.Ct. 2701].) California law does not recognize potential water use as a compensable property right. In *Swanson* v. *Marin Mun. Water Dist.* (1976) 56 Cal.App.3d 512 [128 Cal.Rptr. 485], plaintiff landowner instituted a mandamus action to compel the water district to grant him a pipeline extension and provide water service to his property. The water district previously had enacted an ordinance which allowed new water service to persons with an existing water main fronting their property, but prohibited new service if there was no pipeline extension. As to plaintiff's contentions that the district took his property without just compensation and that he had an absolute right to be treated in the same manner as existing consumers, this appellate district held: "[I]t is evident that a potential water user does not possess any absolute right to be afforded water service and that the Constitution does not require that he be treated in the same manner as established users of the water system." (At p. 522; see also *Hollister Park Inv. Co.* v. *Goleta County Water Dist.* (1978) 82 Cal.App.3d 290 [147 Cal.Rptr. 91], quoting *Swanson*.)

In *Hollister,* the reviewing court faced a situation substantially similar to the present case. There, the landowner sought damages for inverse condemnation, complaining that because the Goleta County Water District would not approve any new water service connections, the landowner's property was rendered unsuitable for development or any other purpose. On appeal the court held: "A potential water user does not possess 'an absolute right to be treated in the same manner as existing water consumers within [a] water district . . . ,'" concluding that damage caused by the moratorium

was not compensable. (*Hollister Park Inv. Co.* v. *Goleta County Water Dist., supra,* 82 Cal.App.3d at p. 294.) The court further pointed out that if the district did not carry out its obligations imposed by the moratorium ordinance, the landowner's remedy was by way of a mandamus proceeding.

Appellants try to distinguish *Hollister* by arguing that this holding primarily addresses the question of remedies, and as such it foreshadowed the now discredited California Supreme Court decision in *Agins* v. *City of Tiburon,* wherein our high court ruled that compensation is not an appropriate remedy for a regulatory taking. (*Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266 [157 Cal.Rptr. 372, 598 P.2d 25] (hereafter *Agins I*), affd. on other grounds in 477 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138].)[13] We disagree. Regardless of the remedies issue, the distinction between the rights of existing consumers versus potential users was essential to resolution of the inverse condemnation claim in both *Hollister* and *Swanson.* Appellants also point out that in *Hollister,* the reviewing court determined the water moratorium was valid on its merits. In fact, the landowner argued on appeal that the ordinance was an impermissible "no growth" policy. The court construed the ordinance itself and determined it was not. Again, this determination does not undermine the court's analysis of the nature of the plaintiff's interest in water service.

Federal courts subsequently have applied the rule in *Swanson* and *Hollister* in the context of deciding constitutional challenges to state water district actions. For example, in *Bank of Am. Nat. T. & S.* v. *Summerland Cty. Water D.* (9th Cir. 1985) 767 F.2d 544, the bank, as trustee of a parcel of land within the jurisdiction of a county water district, brought suit in federal district court challenging the district's system of allocating water. The district court denied a preliminary injunction and stayed proceedings in federal court pending state court adjudication of state law questions. On appeal the reviewing court upheld denial of the preliminary injunction. It reasoned that plaintiffs only had a fair chance of success on the merits of their constitutional claims. Noting that it would make a significant difference whether the state court categorized the fundamental issue as involving land use principles or water law principles, the court stated that if

---

[13] In *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378], the United States Supreme Court held that even a *temporary* taking by land use regulation entitles a landowner to money damages under the Fifth Amendment. The church sued the county for damages, alleging in part that an interim ban on construction or reconstruction of buildings in designated flood protection areas denied it all use of its property. The superior court had struck down these allegations as irrelevant to the claim for damages, reasoning that state precedent (*Agins I*) precluded monetary recovery. The Court of Appeal affirmed, also relying on *Agins I.* The United States Supreme Court reversed, holding that California courts have decided the compensation issue inconsistently with Fifth Amendment requirements. (*Id.,* at p. 311 [96 L.Ed.2d at p. 261].)

the bank could demonstrate land use principles apply, "it may well be able to recover for inverse condemnation." (*Id.*, at p. 548.) It went on to articulate the general principle: "Bank of America is not yet a water user; it is only a potential water user. Under California law, potential water use is not a property right. . . . If potential water use is not property, Bank of America cannot complain that it has been deprived of property, with or without compensation or due process." (*Ibid.*)

Additionally, in *McMillan* v. *Goleta Water Dist.* (9th Cir. 1986) 792 F.2d 1453, the circuit court, in the context of reviewing the landowners' substantive due process claim that the district court wrongfully relied on *Hollister* as determinative of their federal taking claim, explained that *Hollister* stands for the rule that a district's water moratorium is constitutional as applied to potential users. Since the district court in *McMillan* did not determine whether plaintiffs were actual users, as they contended, or merely potential users, the reviewing court remanded for determination of this issue. (At p. 1457.) In so remanding the court stated: "If it finds that they were only potential users, their substantive due process claim must fall in light of *Hollister.*" (*Id.*, at pp. 1457-1458.)

Appellants also attempt to undermine *McMillan*, arguing it is a statute of limitations case, and the language about the need to determine plaintiffs' status as potential or actual user was mere dicta. Wrong again. The court ruled that plaintiffs' taking claim was *not* barred by the statute of limitations. And then, in the context of reviewing appellants' substantive due process claim, the court interpreted the *Hollister* decision. That aspect of the decision was not dicta on the landowner's status as potential or actual user, and had nothing whatsoever to do with the statute of limitations.

(2) *No Regulatory Taking*

■ We conclude under the above authority that appellants have no protected interest in a water connection per se. And, while this determination bears on our resolution of the complex taking issue at bench, it does not entirely dispose of the matter. The complaint alleges that the Department's regulatory action wrongfully prohibited new water connections and in turn deprived appellants of all economically viable use of their property. Given that appellants have related the Department's action to the value of the real property itself, it is appropriate to further analyze these allegations in light of current taking jurisprudence. Undertaking this task, we resolve, for the reasons set forth below, that the Department's sole action of requiring the District to maintain its moratorium on service connections until it could show an improved supply did not amount to a regulatory taking.

(a) *The Appropriate Test*: The parties frame their opposing arguments by tracking the two-pronged test which the United States Supreme Court has fashioned to determine whether the regulatory action in question constitutes a taking under the Fifth Amendment. ▪ "The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests [citation], or denies an owner economically viable use of his land [citation], . . . Although no precise rule determines when property has been taken [citation], the question necessarily requires a weighing of private and public interests." (*Agins* v. *Tiburon* (*Agins II*) (1980) 447 U.S. 255, 260-261 [65 L.Ed.2d 106, 112, 100 S.Ct. 2138]; *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825, 834 [97 L.Ed.2d 677, 687-688, 107 S.Ct. 3141].)

Our Supreme Court has formulated a similar general rule with respect to the latter branch of the federal test: "[A] zoning ordinance may be unconstitutional and subject to invalidation only when its effect is to deprive the landowner of substantially all reasonable use of his property." (*Agins I, supra*, 24 Cal.3d at p. 277; *Pier Gherini* v. *California Coastal Com., supra*, 204 Cal.App.3d at p. 713.) Having set out the separate federal and state constitutional bases for the protection of private property, *Agins I* does not further distinguish their requirements.

California cases frequently do not identify whether the inverse condemnation action is brought under state or federal law, or both, and in any event often discuss federal precedent in deciding state inverse condemnation claims. The recent litigation in *First Lutheran Church* v. *Los Angeles County, supra,* 482 U.S. 304, represents the most startling, wholesale adoption of federal precedent to resolve a state constitutional claim. The lawsuit began solely as a state cause of action. The United States Supreme Court, however, was able to devise a federal question from the church's arguments before the state Court of Appeal. The church asserted recent federal decisions demonstrated federal constitutional error in the California Supreme Court's decision in *Agins I.* Since the Court of Appeal applied *Agins I* to dismiss the church's action, thus rejecting the federal claim, the high court concluded the church preserved a federal question on appeal. On remand to determine whether the county's action amounted to an unconstitutional taking, the Court of Appeal for all practical purposes analyzed the taking claim entirely on the basis of federal decisional law applying and construing the Fifth Amendment. (*First English Evangelical Lutheran Church* v. *County of Los Angeles* (1989) 210 Cal.App.3d 1353 [258 Cal.Rptr. 893]; see also *Ellison* v. *County of Ventura* (1990) 217 Cal.App.3d 455 [265 Cal.Rptr. 795] [using *Agins II* to resolve state inverse condemnation claim].)

Likewise, we are faced solely with a state inverse condemnation action. Like our sister courts, we find federal precedent persuasive on the issue of

what constitutes a confiscatory taking in light of obvious similarities in the constitutional provisions. We thus also consider federal precedent, in particular the test announced in *Agins* and its progeny.

(b) *State Interest Factor*: In *Nollan* v. *California Coastal Comm'n, supra*, 483 U.S. at page 837 [97 L.Ed.2d at page 689], the United States Supreme Court refined the first prong of the *Agins II* test by requiring a close fit between the government interest or purpose and the actual regulation. Now the government's regulation must substantially advance the precise state interest which motivated the regulation. Appellants, of course, claim the Department's action in conditioning the District's permit did not advance any legitimate state interest, raising essentially the same arguments they promoted with respect to the duty causes of actions discussed in part II (a) above.

■ For all of the reasons we considered in that section, we hold the Department's action substantially advanced the state's interest in ensuring a potable water supply which does not endanger the lives or health of its citizens. As we related earlier, the District initially enacted prohibitions on new water connections in response to a declared water shortage emergency. The moratorium was in effect in 1982 when the District applied for an amended permit; by law all such regulations must remain in effect throughout the duration of the emergency and until the supply is improved.

The Department reviewed and investigated the District's *existing* system plus proposed improvement plans, identified certain system deficiencies and concluded that the system, as improved, would meet potability requirements. The system, of course, was a system with a finite number of connections, serving a finite number of users from finite water sources. The Engineering Report stated in conclusion that the system could not support additional connections until a satisfactory source of supply was demonstrated and recommended that the District continue its moratorium until it could develop additional sources or demonstrate an improved supply. The Department then issued an amended operating permit incorporating that recommendation in its entirety.

Without question the condition substantially fits and promotes the valid public health[14] purpose of ensuring a continuous supply of potable water. In

---

[14] The remand directions in *First Lutheran Church* v. *Los Angeles County* suggest that a regulatory program might be a noncompensable regulation under the police power if it legitimately facilitates a public safety objective, even if the public action deprived the owner of all uses of his or her property. Acknowledging that the opinion only addressed the remedies question, Chief Justice Rehnquist wrote: "We . . . have no occasion to decide whether the ordinance at issue actually denied appellant all use of its property *or whether the county might*

the Department's opinion, the improved system would satisfy potability standards, but *augmentation* of that system by way of additional connections would only be advisable if the source were augmented. To then require the District to demonstrate an additional or adequate source was reasonable, and in keeping with the goal of safeguarding water quality as well as the statutory mandates governing the District's enactment of the moratorium and declaration of water shortage emergency. (We arrive at this determination given the Department's *stated* conclusions and rationale without, of course, deciding one way or the other the absolute truth of its analysis.) Finally, the condition itself is not in perpetuity; if and when the District makes the necessary showing, the condition will be removed.

(c) *Denial of Land Uses*: We next review whether the Department's action, while legitimate, nonetheless denied appellants all economically viable use of their land. This task demands attention to the particular circumstances presented in each case. (See *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 124 [57 L.Ed.2d 631, 648, 98 S.Ct. 2646].) With this approach in mind, we focus on the causation factor inherent in the prohibition against extinguishing all viable uses. Quite simply, in our view there must be a sufficient causal linkage between the government regulatory action and the landowner's alleged economic injury to sustain inverse condemnation liability. We undertake to examine the causal links in this case by first identifying the functions of the various parties.

The Department is in the business of overseeing water quality on a statewide basis and regulating the various local service providers. The District must operate pursuant to the permit which the Department has granted, and in that regard is the entity which must attempt to augment its water supply and, failing that, honor its moratorium on new service connections. The County enacts zoning ordinances and establishes permissible land uses within its borders. Appellants purchased properties lacking any water connection.

Against this overview, it is apparent that although the Department is a remote rung on the causal ladder which allegedly has impaired appellants'

---

*avoid the conclusion that a compensable taking had occurred by establishing that the denial of all use was insulated as a part of the State's authority to enact safety regulations.* [Citations.] These questions, of course, remain open for decision on the remand we direct today." (*First Lutheran Church* v. *Los Angeles County, supra*, 482 U.S. at p. 313 [96 L.Ed.2d at p. 262], italics added; see discussion in *First English Evangelical Lutheran Church* v. *County of Los Angeles, supra*, 210 Cal.App.3d at pp. 1359-1363.)

We leave to higher authorities the reconciliation of whether one, or both *Agins II* factors are necessary to establish a compensable regulatory taking, or yet again whether there is a hierarchy of public purposes such that certain public safety programs might be treated differently from other legitimate regulatory activities. The Department's action survives analysis under both aspects of the *Agins II* test.

ability to develop their land, the Department cannot, does not, and did not, regulate land use. The Department's single act of requiring the District to maintain the status quo on service connections until it can improve supply simply is not a restriction on land use or development. The moratorium condition itself does not require appellants to give up or restrict any uses to which they can put their land. The County, not the Department, zones and determines water service and supply prerequisites to residential and other development.

Further, as the Department points out, appellants bought real property lacking any service connection to the District's system. As far as the pleadings disclose, the land is in the "same state today as when they acquired it. The complaint alleges there is no market for their property because no purchaser will buy as long as the moratorium remains in effect, but the Department has done nothing to take, damage or otherwise diminish the value of what they have always had—essentially unimproved real property with no access to potable water. They say the difference now is that the Department's action has superseded the District's moratorium and ensures they will never receive a connection. Not true. The condition by its terms lapses when, and if, the District can make a showing of improvement. Thus in our opinion the Department has done nothing to extinguish a fundamental attribute of ownership. (See *Agins II, supra,* 447 U.S. at p. 262 [65 L.Ed.2d at p. 113].) It is up to the District, if it can, to surmount the obstacles which forced it to enact the moratorium in the first instance.

If, as is the case, a potential water user has no absolute right to water service; and if, as is also the case, the Department has authority to require a district which has declared a water shortage emergency to show augmentation of its water supply before it allows more service connections, how can appellants reasonably argue that our Constitution nonetheless requires the Department to pay them $500,000 in damages because (1) the District, which has not made the required showing, denied their applications for water service and (2) the County will not allow them to develop their property without water service? Our inverse condemnation laws do not stretch this far.

Appellants direct our attention to a number of cases which they assert solidify their position that the "indirect" effects of state action can constitute a regulatory taking even though the agency does not directly regulate real property. We easily distinguish these cases; their authority does not support the proposition that an inverse condemnation action can be stated on as tangential a relationship as exists between the Department's action and appellants' *vested* property interests.

For example, appellants cite *Jones* v. *People* ex rel. *Dept. of Transportation* (1978) 22 Cal.3d 144 [148 Cal.Rptr. 640, 583 P.2d 165] as an example of a taking by indirect government action. There, plaintiffs bought property with frontage on Fair Oaks Boulevard, intending to subdivide, with access from the boulevard to the subdivision. The Department of Transportation announced plans to construct a freeway which would cross plaintiffs' property and cut off access from Fair Oaks Boulevard. Pursuant to provisions of the Streets and Highway Code, the department entered into a freeway agreement with the county to reroute or close streets which would intersect with the freeway, and further providing that no road could be opened into or connected with a freeway without permission of the state commission. The county refused to approve plaintiff's subdivision map because of the state's freeway requirements.

The Supreme Court held that plaintiffs were entitled to recover damages against the state because its actions substantially impaired their access. (*Jones* v. *People* ex rel. *Dept. of Transportation, supra*, 22 Cal.3d at p. 151.) The state blamed the county, arguing the county erroneously interpreted the law and the agreement when it refused plaintiffs' map. The court said the state could not rely on this contention because the state had implied that it concurred plaintiffs were not entitled to access due to the impending freeway project. (*Id.*, at p. 153.) While it was the county, not the state, that actually denied the map, the major difference between this case and the present is that in *Jones,* plaintiffs *started out* with accessible property. Then the state, through its actions, encouraged local action which deprived the owners of access and the ability to subdivide their property. Unlike the denial of water service to a potential water user which is not compensable because there is no absolute right to begin with, under state law substantial impairment of access entitles the landowner to compensation.[15]

Appellants next refer us to the case of *Front Royal & Warren Cty. Ind. Park* v. *Front Royal* (W.D.Va. 1989) 708 F.Supp. 1477 for the proposition that it is immaterial whether appellants have a state-recognized property interest in the expectation of an improvement such as a water connection.

---

[15]Appellants' reference to pure dicta in *Kennedy* v. *County of San Mateo* (1960) 179 Cal.App.2d 596 [3 Cal.Rptr. 902] does not persuade us to ignore this distinction. There, the water district denied petitioner's application to connect with the existing main on the ground such a connection would violate certain laws and regulations. The Court of Appeal held this decision was arbitrary because the cited laws were not mandatory and did not supply a reason for denying the connection. In so holding the court stated such an arbitrary refusal "would be practically confiscating petitioners' property for residence property without domestic water service is well nigh valueless." (*Id.*, at p. 600.) This language is not binding. There was no inverse condemnation claim before the court and, thus, no analysis of the nature of the petitioner's property interest and, in any event, the district's action was deemed unlawfully arbitrary.

In *Front Royal,* the Town of Front Royal was under orders of annexation to extend sewer service to annexed parcels within a certain period of time. The town did not extend service to plaintiffs' annexed parcels, and the time for performance lapsed. On cross-motions for summary judgment, the district court held as a matter of law the town's action exacted a taking for which plaintiffs deserved compensation. (At p. 1484.) What appellants fail to point out is that the court also ruled the annexation orders brooked no interpretation and the town was *legally obligated* to provide sewer service to plaintiffs' land. It follows that plaintiffs had a right to the connections, again, unlike appellants here.

Finally, appellants cite *Sederquist* v. *City of Tiburon* (9th Cir. 1984) 765 F.2d 756 for the principle that regulations other than general zoning laws can amount to a taking. We do not disagree. But, again, appellants fail to point out key distinguishing circumstances. For example, the contested action was a requirement that owners of lots within a certain subdivision submit a subdivision map (or, alternatively, a master plan) in order to develop their property consistent with existing zoning law. The city took the position that the subdivision was illegal and, thus, the owners would need to comply with all requirements for a legal subdivision before proceeding with their plans, including preparation of a master plan. The landowners applied to develop their property but did not submit a master plan, contending such a requirement was illegal under state law because it required "joint action" between property owners. The appellate court reversed summary judgment in favor of the city, ruling in part that to the extent the regulation was inconsistent with state law, a material factual question arose as to whether it was reasonably necessary to advance the state interest. (At p. 760.) Although not a general zoning law, the application condition was a land-use decision directly governing the land development process as applied to plaintiffs' property. The decision stemmed directly from the city's authority to regulate and control subdivisions.

In sum, these cases do not dissuade us from our decision that appellants have failed to state a viable cause of action. In a regulatory taking case such as this where the government action does not physically appropriate, invade or damage appellants' property; where appellants had no recognized property interest in the very improvement, the denial of which allegedly led to extinction of all viable use of their land; and where we cannot meaningfully characterize the public action as coming within the field of regulating or restricting land use, we conclude the state has not, in any constitutional sense, caused the purported extinction. Under these circumstances the relationship between the Department's action and appellants' purported detriment is simply too tenuous to sustain inverse condemnation liability. Balancing the public benefit of the Department's action against the burden of

*its* impact on *recognized* private property interests, we hold there was no constitutional taking here.

We affirm the judgment of dismissal in its entirety.

Channell, J., and Perley, J., concurred.